**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

ARTHUR J. FLOT                                    CIVIL ACTION

VERSUS                                            NO. 04-1542

N. BURL CAIN, WARDEN                              SECTION "J"(5)

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge
for the purpose of conducting hearings, including an evidentiary
hearing, if necessary, and submission of proposed findings and
recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B)
and (C), and as applicable, Rule 8(b) of the Rules Governing
Section 2254 Cases.  Upon review of the entire record, the court
has determined that this matter can be disposed of without an
evidentiary hearing.  See 28 U.S.C. §2254(e)(2).  Accordingly, it
is recommended that the petition be **DENIED WITH PREJUDICE.**

## PROCEDURAL HISTORY

On May 9, 1996, petitioner, Arthur Flot, was charged by bill
of information with attempted first degree murder.  At his
arraignment on May 20, 1996, Flot entered a plea of not guilty.  On
November 13, 1997, Flot entered a plea of guilty as charged,

1

reserving his right to withdraw his plea if the State filed a habitual offender bill of information.  On January 5, 1998, Flot withdrew his plea of guilty and entered a plea of not guilty.  On February 1, 1998, following trial by jury, Flot was found guilty of aggravated battery.  On February 13, 1998, Flot was sentenced to ten years incarceration without benefit of parole, probation or suspension of sentence.  On March 4, 1998, following a hearing, the trial court adjudicated Flot to be a third-felony offender and sentenced him to life imprisonment without benefit of parole, probation or suspension of sentence.

Pursuant to his appeal, on February 2, 2000, the Louisiana Fourth Circuit Court of Appeal affirmed Flot's conviction and sentence.  State v. Flot, No. 98-KA-2950 (La. App. 4 Cir. 2000) (unpublished opinion).[1]  Approximately one year later, on February 9, 2001, the Louisiana Supreme Court denied petitioner's writ application.  State v. Flot, 785 So.2d 26 (La. 2001).

Following the conclusion of his direct appeal proceedings, Flot sought post-conviction relief.  His efforts in this regard culminated on May 14, 2004, when the Louisiana Supreme Court denied his writ application.  State ex rel. Flot v. State, 872 So.2d 513 (La. 2004).

In the instant federal habeas corpus action, petitioner raises

_____

[1]A copy of the Louisiana Fourth Circuit's unpublished decision is contained in the State rec., vol. 2 of 4.

the following claims: 1) The State withheld exculpatory, material evidence; 2) He was denied effective assistance of counsel[2]; 3) He was denied due process when the trial court failed to adhere to the "safeguard requirements" of LSA-R.S. 15:529.1(D); and, 4) He was improperly adjudicated to be a third felony offender.  While the State, in its original response (rec. doc. 5), challenged the timeliness of the instant petition, the court, based upon the reasoning set forth in its January 31, 2005 minute entry (rec. doc. 7), determined that petitioner had, in fact, filed his federal habeas petition within the applicable one-year statute of limitations.  See 28 U.S.C. §2244(d).  The State does not contest, and review of Flot's state court filings confirms, the fact that Flot raised all of the claims set forth in the instant action in his state direct appeal and/or post-conviction proceedings, both of which were pursued to the state's highest court.  Accordingly, petitioner has exhausted his state court remedies as required under Rose v. Lundy, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).  Before proceeding to the merits, the court shall set forth a summary of the facts obtained from the state appellate court's unpublished opinion, State v. Flot, No. 98-KA-2950 (La. App. 4 Cir. 2000), along with this court's review of the trial testimony.

---

[2]An alleged denial of his constitutional right to effective assistance of counsel comprises two of the five claims set forth in Flot's habeas corpus petition.  The court, in this report and recommendation, has consolidated Flot's ineffectiveness claims.

**FACTS**

On March 28, 1996, petitioner, who was incarcerated in Orleans Parish Prison, was transferred to Charity Hospital for the purpose of undergoing medical tests. One of the Orleans Parish Deputy Sheriffs charged with the responsibility of safeguarding petitioner during his visit to Charity Hospital was Deputy Theodore Vincent Picraux, Jr. Deputy Picraux escorted petitioner, who was handcuffed and shackled, to the hospital's seventh floor for the purpose of undergoing a gastrointestinal test.

After petitioner's testing had been completed, Deputy Picraux handcuffed and shackled petitioner then proceeded to escort him downstairs to the first floor where the "hospital cell" was located. Before reaching the cell, petitioner advised that he needed to use the restroom, so Deputy Picraux took him to a first floor restroom.

Upon entering the restroom, Deputy Picraux took off petitioner's handcuffs and shackles, then waited outside petitioner's stall. Shortly thereafter, petitioner bolted from the stall and grabbed Deputy Picraux's revolver out of its holster. A struggle ensued and Deputy Picraux was shot in his left elbow, causing his left arm to go completely numb. As petitioner and Deputy Picraux continued to struggle, three more shots were fired which ricocheted off the restroom walls.

During his struggle with petitioner for possession of the

4

revolver, Deputy Picraux testified that he never pulled the gun's trigger.   When asked who did pull the trigger, Deputy Picraux responded:   "Well, there was only one other person in the bathroom."[3]

Following the above-described struggle, petitioner ultimately gained complete control of the revolver and proceeded to point it at Deputy Picraux, advising that he would kill Picraux if the deputy got in his way.   Despite the fact that he had a gun pointed at him, Deputy Picraux managed to use his radio to alert fellow deputies of the situation.   Believing that petitioner was going to shoot him, Deputy Picraux slowly commenced to step backwards towards the door, all the while talking to petitioner in an attempt to persuade petitioner not to kill him.   Petitioner, however, rather than continuing to point the gun at the deputy, turned the revolver on himself, ultimately shooting himself in the abdomen. Petitioner then dropped the revolver, and Deputy Picraux, after kicking the gun away from petitioner, fled the restroom.

On the day of the shooting, New Orleans Police Sergeant Michael Bossetta was the day watch commander of the Eighth Police District's Downtown Development District which encompasses Charity Hospital.   Officer Bossetta received word that an officer had been shot in Charity Hospital and that there was a possible hostage

---

[3]See State rec., vol. 3 of 4, trial transcript at p. 17, line 31 and p. 18, line 1.

situation.   Upon arriving on the scene, Officer Bossetta heard a gunshot and witnessed Deputy Picraux exiting the restroom.   He observed the wound to Deputy Picraux's left elbow, then entered the restroom and saw petitioner lying on the floor with a close contact gunshot wound to his abdomen.   Officer Bossetta noted that the revolver lying near petitioner contained five spent casings and one live round.   Bossetta admitted that no test was performed to ascertain who had fired Deputy Picraux's revolver.   Bossetta explained that the necessary procedure, called a "paraffin test", involves placing a solution on a person's skin to reveal the presence of gunpowder and it must be performed within approximately an hour of the time the gun was fired.   In this case, both petitioner and Deputy Picraux were rushed into surgery after the shootings, before any tests could be performed.[4]

## ANALYSIS

### A.  State Withheld Exculpatory, Material Evidence

Petitioner claims that the prosecution unconstitutionally suppressed the following evidence:  1) A taped statement of Mr. Jack Quinn; 2) An incident report prepared by Sergeant Bossetta; and, 3) An inter-office memo prepared by the Special Investigation Division of the Orleans Parish Criminal Sheriff's Office.

Whether or not evidence was unconstitutionally suppressed is

---

[4] See State rec., vol. 3 of 4, trial transcript at p. 80, lines 12-31 and p. 81, lines 1-18.

a mixed question of law and fact, see Trevino v. Johnson, 168 F.3d 173, 184 (5th Cir.), cert. denied, 527 U.S. 1056, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999), and as such, federal habeas relief is warranted only upon a determination that the state court decision rested on an "unreasonable application" of clearly established federal law, as determined by the Supreme Court, to the facts of the case. 28 U.S.C. §2254 (d)(1).  The clearly established law in this area was enunciated by the Supreme Court in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).  Under Brady and its progeny, "[t]he prosecution's suppression of evidence favorable to the accused violates the Due Process Clause if the evidence is material either to guilt or to punishment." Kopycinski v. Scott, 64 F.3d 223, 225 (5th Cir. 1995), citing Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).  The prosecution is required to disclose to the defense both exculpatory evidence and evidence that would be useful for impeachment.  Brady, 373 U.S. at 87, 83 S.Ct. at 1196; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); United States v. Bagley, 473 U.S. 667, 675-76, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).  Thus, to prove a constitutional violation as contemplated under Brady, a petitioner must show that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material. United States v. Hughes, 33 F.3d 1248, 1251 (10th Cir.1994).

With respect to Jack Quinn's statement, the initial problem petitioner faces, in terms of meeting his burden of proof, is proving that it was suppressed. A review of the state court record reflects that Mr. Quinn testified at a September 27, 1996 hearing at which both petitioner and his counsel were present.[5] Evidence is not considered suppressed under Brady if the defendant or his attorney "knew, or should have known," of its existence. United States v. Payne, 63 F.3d 1200, 1208 (2nd Cir. 1995), cert. denied, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996).

Petitioner likewise cannot establish that the allegedly suppressed statement was "material". As the Court explained in Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) (quotation and citation omitted), materiality is established "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

According to petitioner, Quinn saw the deputy and petitioner inside the restroom and "observed the deputy on top of petitioner during a struggle and the deputy had the gun pointed at

---

[5]A copy of a minute entry documenting the September 27, 1996 hearing is contained in the State rec., vol. 2 of 4. This court has attempted to obtain a transcript of Jack Quinn's September 27, 1996 hearing testimony. Unfortunately, the court has recently been informed, via an affidavit (rec. doc. 28) from the pertinent court reporter, Lynnette N. Conerly, that the tape of the September 27, 1996 proceeding was "stored in [her] home and [her] home and all contents were destroyed in the floodwaters of hurricane 'Katrina'".

petitioner."  This information, petitioner asserts, "would have assisted counsel in impeaching the deputy's testimony at trial."[6]

A review of the trial testimony of Sergeant Bossetta reflects that it is questionable whether or not Mr. Quinn did, in fact, look inside the restroom while gunshots were being fired and petitioner and the victim struggled over the gun.  Bossetta testified that Mr. Quinn was walking down a first floor hallway in Charity Hospital when he heard two loud noises which he did not immediately recognize as gunshots.  According to Bossetta, Quinn, upon hearing the noises, got the attention of a "Charity Hospital policeman" and directed the policeman to the restroom, the area from where the noise was emanating.[7]

Further, assuming, <u>arquendo</u>, that Quinn, in his statement, did provide that he observed the deputy on top of petitioner and saw the deputy pointing the gun at petitioner, such a statement, though contrary to portions of Deputy Picraux's testimony, does not directly refute Deputy Picraux's testimony to the effect that he did not pull the gun's trigger nor does it overcome the important fact, in terms of supporting the jury's guilty verdict, that Deputy Picraux suffered a gunshot wound.

Petitioner likewise cannot establish the requisite materiality

---

[6] <u>See</u> Federal rec., doc. 1, petitioner's supporting memorandum at pp. 9-10.

[7] <u>See</u> State rec., vol. 3 of 4, trial transcript at p. 84, lines 23-31 and p. 85, lines 1-7.

with respect to the allegedly suppressed report of Officer Bossetta and inter-office memo from the Special Investigation Division of the Orleans Parish Criminal Sheriff's Office.[8]  As with Quinn's statement, petitioner argues that information contained in Bossetta's report and the inter-office memo "would have assisted defense counsel in impeaching the [S]tate's only witness at trial", i.e., Deputy Picraux.[9]  However, as shown below, petitioner, in support of his argument, relies upon only insignificant discrepancies between Deputy Picraux's trial testimony and the information he provided to officials for purposes of preparing the pertinent reports.

With regard to Bossetta's report, first petitioner notes that the report provides that the gun initially was fired twice, whereas Deputy Picraux testified that "the gun discharged <u>ONE TIME</u> during the initial struggle, which struck the deputy in the left elbow [emphasis original]."[10]  Second, in his report, Bossetta sets forth that petitioner "wrested the deputy's service revolver away from him and fired two shots at the deputy striking the deputy in the right arm".  In contrast, at trial, Deputy Picraux never stated

---

[8]Copies of both Bossetta's report and the inter-office memo are attached to petitioner's memorandum and are contained in the State rec., vol. 1 of 4.

[9]<u>See</u> Federal rec., doc. 1, petitioner's supporting memorandum at p. 10.

[10]<u>See</u> Federal rec., doc. 1, petitioner's supporting memorandum at p. 11.

that he saw petitioner pull the trigger of the revolver.  Third, the report provides that petitioner informed Deputy Picraux that he wanted to commit suicide and that after petitioner shot himself, Deputy Picraux jumped on top of petitioner, the two wrestled over the gun, and another round was fired.  In contrast, at trial, Deputy Picraux testified that after petitioner shot himself in the abdomen, there was no further wrestling over the gun and no further rounds fired.  Deputy Picraux stated that after shooting himself, petitioner dropped the gun, Picraux kicked it away, then exited the restroom.

With respect to the inter-office memo, petitioner points to references to the effect that petitioner informed Deputy Picraux that he wanted to kill himself because "he was facing a lot of time which he could not handle" and that Deputy Picraux "turned his head" upon seeing petitioner point the gun against his stomach.  In contrast, Picraux, in his trial testimony, makes no reference to any suicide threat on the part of petitioner nor does Picraux provide that as a result of his having turned his head away, he did not actually see petitioner shoot himself.

Clearly, the above, relatively minor discrepancies between the information contained in the reports and the information provided by Deputy Picraux at trial is insufficient to satisfy the materiality requirement of <u>Brady</u>.  Accordingly, petitioner is not entitled to habeas corpus relief.

**B.  Denial of Effective Assistance of Counsel**

A claim of ineffective assistance of counsel is a mixed question of law and fact.  Boyle v. Johnson, 93 F.3d 180, 187 (5th Cir. 1996).  As such, this court may grant habeas relief only upon a determination that the state court decision rested on an unreasonable application of clearly established Supreme Court law to the facts of the case.  See Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).

The seminal Supreme Court decision regarding ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the Strickland test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), citing Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.  To prove prejudice under the Strickland

standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

As noted earlier, petitioner's assertion of ineffectiveness encompasses two of his claims, claims 2 and 5. While some of the arguments supporting claims 2 and 5 overlap, for the most part, the arguments comprising claim 2 were raised in connection with petitioner's post-conviction application and the arguments encompassing claim 5 were raised on direct appeal.

In connection with both claims 2 and 5, petitioner complains that counsel failed to pursue pre-trial motions and potential witnesses, failed to pursue various lines of questioning with respect to his cross-examinations of Deputy Picraux and Officer Bossetta and filed a frivolous writ to the state appellate court.[11] Petitioner attributes these problems, in part, to a "lack of continuity" attributable to the fact that during the time, in excess of two years, which "it took to get [his] case to trial, [he] had four different attorneys".[12] However, as both the state appellate court noted on direct appeal and the state district court noted in addressing petitioner's post-conviction application,

---

[11]See Federal rec., doc. 1, petitioner's supporting memorandum at pp. 15-17.

[12]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 30.

petitioner, in connection with these claims, has failed to show how he was prejudiced by any of these alleged deficiencies.[13] Accordingly, his claim for habeas relief based upon these arguments is without merit.

Petitioner next complains about counsel's failure to object to certain portions of direct testimony offered by Deputy Picraux and Officer Bossetta, claiming that these lay witnesses were improperly offering expert testimony.  With respect to Picraux, petitioner complains that he should not have been allowed to offer testimony about the workings of his revolver, a weapon which he purchased and had owned for 14 months prior to the incident at issue,[14] and should not have been allowed to testify with regard to his medical condition.  With respect to Officer Bossetta, petitioner complains that he should not have been allowed to testify regarding powder marks on petitioner's clothing nor should he have been allowed to describe what was depicted in photographs taken of the Charity Hospital restroom after the incident at issue.  A review of the pertinent portions of the trial transcript reflects that neither of these witnesses were asked technical questions requiring expertise.

With respect to his revolver, Picraux merely informed that his

---

[13]A copy of both the Louisiana Fourth Circuit's direct appeal opinion and the state district court's post-conviction judgment are contained in the State rec., vol. 2 of 4.

[14]See State rec., vol. 3 of 4, trial transcript at p. 22, lines 18-24.

gun was a "double action" weapon, rather than a "single action", and that one had to "pull the trigger" for the gun to fire, it would not fire by merely being dropped on the floor.  Picraux estimated that it took "three to four pounds of pressure to pull the trigger" of his revolver.[15]  Picraux, however, as evidenced by the colloquy set forth below, refused to go into greater detail regarding the "workings" of his revolver when, to do so, would place him beyond the realm of his personal knowledge.

> Q.  Does it have a longer trigger pull than like an automatic weapon or something like that?
>
> A.  Well, I have never used an automatic, so I don't know if I can compare the two.  I have only had two revolvers.[16]

As for Picraux's "medical" testimony, he testified not with respect to his medical prognosis, clearly something that would be reserved for a medical expert, but rather, with respect to the injury he had sustained and the medical treatment he had received. Picraux explained that as a result of the incident at issue, he was out of work for seven months, was unable to write for five months, that he had spent four days in the hospital, and had undergone one surgery, along with physical therapy.[17]  With regard to his surgery,

---

[15]See State rec., vol. 3 of 4, trial transcript at p. 23, lines 5-15.

[16]See State rec., vol. 3 of 4, trial transcript at p. 23, lines 16-22.

[17]See State rec., vol. 3 of 4, trial transcript at pp. 18, 21-22.

Picraux did offer hearsay testimony to the effect that medical personnel had informed, at the time of his surgery, "that if the bones did not heal [he] would have to have a bone graft."[18] However, this hearsay testimony amounted to nothing more that a medical opinion regarding the proverbial "worst case scenario" which, in this instance, did not come to fruition.   Clearly, petitioner has not shown the requisite prejudice resulting from this hearsay testimony.

With regard to Bossetta, petitioner complains that he should not have been allowed to offer testimony regarding the powder marks on petitioner's clothing, the ammunition in Deputy Picraux's revolver, and the blood splatters and pellet marks depicted in photographs taken of the inside of the pertinent restroom. However, a review of Bossetta's testimony reflects that his comments were essentially common sense conclusions which any lay person, upon examining petitioner's clothing, Picraux's gun, and the pertinent photographs, would have surmised.

With respect to the powder marks, Bossetta simply noted that the more pronounced the powder mark on a garment, the closer the barrel of the weapon was when the shot was fired.   Specifically, Bossetta informed:

> Basically, when you have a powder burn on the garment or even against the skin, of course, it's more prevalent and

---

[18]See State rec., vol. 3 of 4, trial transcript at p. 31, lines 8-12.

easier to observe on a garment, the more pronounced it is
in its shape, which is usually, with a revolver, ...
circular, shows that its - - its closeness to the barrel
of the weapon or the muzzle, we call it.  In other words,
it's more of a point blank wound.[19]

As for his testimony regarding the ammunition in Picraux's

revolver, Bossetta merely commented on what he saw when he opened

the revolver's cylinder, stating:

> A.  I found it to contain five shell casings which were -
> - in other words, five shot bullets and one bullet which
> was not shot which is called a live round.
> Q.  And it holds six altogether?
> A.  Right.  There were six cartridges in the cylinder,
> five were spent, meaning they were fired, one was not
> which means there were five shots fired.[20]

Similarly, Bossetta's testimony regarding the photographs was

limited to what he saw upon examining pictures of the crime scene.

In fact, given that he was not an expert, Bossetta was specifically

warned not to "speculate" as to what he thought the pictures

depicted, but rather, to limit his testimony to "what [he] saw" in

the photographs.[21]  As reflected by the colloquy set forth below,

Bossetta heeded this warning.

> A.  This is blood on the wall above where ... defendant
> was prostrated.  This is the area of the floor in the
> bathroom where the defendant was lying next to the gauze,
> right here.  This is a button next to the drain towards

---

[19]See State rec., vol. 3 of 4, trial transcript at p. 63, lines
19-31.

[20]See State rec., vol. 3 of 4, trial transcript at p. 72, lines
3-13.

[21]See State rec., vol. 3 of 4, trial transcript at p. 70, lines
13-18.

the front area of the bathroom which was - - which fell
from the deputy's uniform.
Q.  All right.
A.  This is the radio above the urinal and the hat that
the deputy was wearing.
Q.  All right.
A. This again is the radio.  It's hard to see, it's
covered with blood.  Can ya'll see that, the radio
resting on top of the urinal?
Q.  All right.
A.  This is another entrance of a pellet [i.e., bullet].
There [were] five shots fired in the struggle.  This is
another pellet making three.  This is pellet number four,
lying in the corner of the stall, the rear stall.  This
is a close-up of the deputy's hat.  This is the trash can
cover, top that was inverted during the struggle which is
covered in blood.  You can see it's flipped over.  This
is a duplicate of the eyeglasses and this is a close-up
of the blood on top of the trash can positioned in front
of the rear stall where the first struggle ensued.[22]

With respect to his testimony regarding pellets or bullets
being lodged in restroom walls, Bossetta informed that these
bullets came from Deputy Picraux's revolver.  Petitioner complains
that counsel was ineffective for failing to object to this
testimony since there were no "lab tests" performed which
scientifically proved that the bullets came from the deputy's
weapon.  However, since the evidence was unrefuted that Deputy
Picraux's gun was the only one fired in the hospital restroom, lab
tests linking the gun with the bullets was unnecessary.  Officer
Bossetta's testimony that the lodged bullets came from the deputy's
weapon was not based upon any presumed expertise, but rather, on
the fact that bullets, as reflected in the photographs, were lodged

_____

[22]See State rec., vol. 3 of 4, trial transcript at p. 70, lines
19-31 and p. 71, lines 1-27.

in the restroom walls and Deputy Picraux's revolver was the only weapon fired inside the restroom.

Petitioner's remaining ineffectiveness claims are all set forth as part of claim 5 and were all addressed, and rejected, by the Louisiana Fourth Circuit Court of Appeal in connection with petitioner's direct appeal.  Specifically, petitioner argues that counsel was ineffective in failing to object to the trial court's sentencing error in originally sentencing petitioner, in connection with his aggravated battery conviction in violation of La. R.S. 14:34, to ten years incarceration without benefit of parole, probation or suspension of sentence.  Such a sentence was in error because La. R.S. 14:34 does not provide that the maximum sentence of ten years be served without benefit of parole, probation or suspension of sentence.  However, as the state appellate court noted, petitioner was not prejudiced by counsel's deficiency in this regard since the trial court's original, erroneous sentence was vacated when petitioner was sentenced as a habitual offender.

Petitioner next complains that counsel was ineffective, in connection with the sentencing phase of his proceedings, by virtue of his failure to "request a presentence investigation", failure to "develop and present any witnesses in mitigation", and failure to object when the trial court referred to petitioner as a

"predator".[23]   However, given the fact that petitioner's prior convictions were for crimes of violence and given the violence associated with the instant crime, the state appellate court concluded that petitioner "has not shown that defense counsel's failure to request a presentence investigation or present any mitigating factors was prejudicial to him", nor did he show "that he was prejudiced by counsel's failure to object to the trial court's ... reference to him as a 'predator.'"   <u>Flot</u>, No. 98-KA-2950 at p. 10.   This court finds that the state appellate court's finding in this regard does not represent an unreasonable application of <u>Strickland</u>, specifically, the second prong of <u>Strickland's</u> two-part test, to the facts of this case.   <u>See</u> <u>Williams</u>, <u>supra</u>.   Accordingly, petitioner is not entitled to federal habeas corpus relief.

Petitioner also asserts that counsel was ineffective for failing to challenge the use of his "<u>Alford</u> plea" as a basis for adjudicating him to be a multiple offender.   An "<u>Alford</u> plea" is one in which a defendant voluntarily, knowingly, and understandingly consents to the imposition of a sentence but is unwilling to admit his participation in the acts constituting the crime.   The Supreme Court, in <u>North Carolina v. Alford</u>, 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162 (1970), made clear that

---

[23]<u>See</u> Federal rec., doc. 1, petitioner's supporting memorandum at p. 31.

"while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty."

Petitioner, in 1994, was charged with the crime of purse snatching.  In exchange for a reduced charge of simple robbery and the promise that he would receive a 14-month sentence and would not be multiple billed, petitioner "entered an 'Alford plea'".  Flot, No. 98-KA-2950 at p. 3.

Petitioner argues that his earlier Alford plea could not properly be considered as a prior conviction for purposes of finding him to be a multiple offender because the court, in accepting his Alford plea, did not advise him that his conviction could be used to enhance his sentence in connection with a subsequent conviction.  As shown below, petitioner's argument in this regard is without merit.

As the Louisiana Fourth Circuit noted, under state law, specifically, State v. Walters, 591 So.2d 1352 (La. App. 4 Cir. 1991), "there is no requirement that a trial court inform a defendant entering an 'Alford plea' that his conviction may be used as a predicate conviction for sentence enhancement." Flot, No. 98-KA-2950 at p. 5.  There is likewise no requirement under the Constitution that a defendant entering an Alford plea be advised that his conviction, as a result of his plea, could be used to enhance his sentence in connection with a subsequent conviction.

21

See generally Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); Neyland v. Blackburn, 785 F.2d 1283, 1287 (5th Cir.), cert. denied, 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 352 (1986).  Further, as the Louisiana Fourth Circuit stated, it makes no difference whether or not a defendant entered his Alford plea in accordance with or against the advice of counsel.  Such a factor does not render a plea involuntary and/or unknowing.  Accordingly, counsel's failure to object to the trial court's use of petitioner's "Alford plea conviction" for the purpose of enhancing his sentence did not prejudice petitioner.

Petitioner also states that counsel was ineffective because he "filed no motion for reconsideration of the sentence" and "filed no timely motion for appeal".[24]  Both of these assertions were specifically addressed, and rejected, by the Louisiana Fourth Circuit on direct appeal.

With respect to petitioner's claim that counsel was ineffective by virtue of his failure to file a motion for reconsideration, the Fourth Circuit properly determined that petitioner had failed to make the requisite prejudice showing since, given the violence associated with petitioner's past crimes, as well as the crime at issue, "there has been no showing that [petitioner] could have proved by clear and convincing evidence

---

[24]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 28.

that the mandatory life sentence imposed on him was unconstitutionally excessive." Flot, No. 98-KA-2950 at p. 11. As for petitioner's claim of ineffectiveness based on counsel's failure to file a timely notice of appeal, the state appellate court correctly concluded that, once again, petitioner failed to show that he was prejudiced by this deficiency since his "motion for appeal, filed some four and one-half months after his sentencing, was granted by the trial court." Flot, No. 98-KA-2950 at p. 11. Accordingly, petitioner's claims are without merit.

Petitioner, in support of his ineffectiveness claim, also asserts that even though, in his opinion, "he has demonstrated actual prejudice", "some of counsel's errors were so egregious that prejudice should be presumed without the necessity of a showing of actual prejudice."[25] In support of this position, petitioner cites United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

In Cronic, 466 U.S. at 659-661 and nn.25-28, 104 S.Ct. at 2047-2048 and nn. 25-28, the Supreme Court provided that unconstitutional ineffectiveness may be inferred, thereby relieving a habeas petitioner of the burden of proof imposed under Strickland, supra, but only in rare situations, such as: 1) Where the accused is completely denied counsel at "a critical stage of

_____

[25]See Federal rec., doc. 1, petitioner's supporting memorandum at p. 19.

his trial"; 2) Where counsel "actively represented conflicting interests"; or 3) Where counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." The instant matter does not fall under one of the above-listed "rare situations". Accordingly, petitioner is not relieved of his burden of proving prejudice and, as he clearly has failed to make such a showing, is not entitled to habeas corpus relief.

### C. Court Failed to Adhere to the "Safeguard Requirements" of LSA-R.S. 15:529.1(D)

Petitioner claims that he is entitled to habeas corpus relief because the trial judge did not follow the procedures set forth in LSA-R.S. 15:529.1(D) in that he did not inform petitioner of his right to remain silent and did not inform him of the particular allegations of the multiple bill. However, the fact that a state court proceeding may be violative of a state law is irrelevant for purposes of attaining habeas corpus relief. Federal habeas review is limited to questions of constitutional dimension. See generally Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir. 1992), cert. denied, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); Castillo v. Johnson, 141 F.3d 218, 222 and 224 (5th Cir.), cert. denied, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998).

Additionally, as the state district court noted upon addressing

this issue on post-conviction, a review of the pertinent transcript reflects that petitioner raised no objections with respect to his multiple offender hearing.[26]   Instead, such a review reveals that the State, via the unrefuted testimony of a fingerprint expert, clearly established that petitioner, in addition to his most recent, aggravated battery conviction, had two prior convictions. Petitioner's right to remain silent during the proceeding was in no way infringed.   When asked whether or not he would like to speak, petitioner responded, "No, Your Honor."[27]  Accordingly, petitioner's claim for habeas relief is without merit.

### D.   Improperly Adjudicated to be a Third Felony Offender

Petitioner challenges his multiple offender adjudication based upon his claim that his <u>Alford</u> plea conviction could not properly be used as a basis for finding him to be a third felony offender. For the reasons set forth in connection with petitioner's claim that his counsel was ineffective for failing to object to the State's use of his <u>Alford</u> plea conviction as a prior offense, the instant claim is without merit.[28]

---

[26]A copy of the transcript of petitioner's March 4, 1998 multiple bill transcript is contained in the State rec., vol. 1 of 4.   A copy of the state district court's post-conviction opinion is contained in the State rec., vol. 2 of 4.

[27]<u>See</u> State rec., vol. 1 of 4, multiple-bill hearing transcript at p. 5.

[28]<u>See</u> discussion <u>supra</u> at pp. 20-22.

## RECOMMENDATION

It is therefore RECOMMENDED that the petition of Arthur Flot for habeas corpus relief be DENIED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 14th day of _____ June _____, 2007.


ALMA L. CHASEZ
United States Magistrate Judge

26